UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                                Case No. 13-20003

vs.                                        HON. MARK A. GOLDSMITH

DOUGLAS FRANK REED,

        Defendant.

_____/

**OPINION & ORDER
DENYING DEFENDANT'S MOTION FOR COMPASSIONATE
RELEASE (Dkt. 35)**

Defendant Douglas Reed is currently incarcerated at the Federal Correctional Institution, Elkton. After pleading guilty to one count of possession of child pornography and one count of distribution of child pornography, Reed was sentenced by the Honorable John Corbett O'Meara to 132 months' imprisonment. Judgment (Dkt. 27).[1] Reed has served approximately seven years of his 11-year sentence. His projected release date is May 29, 2023.

On May 11, 2020, Reed tested positive for COVID-19. See Bureau of Prisons Medical Records at PageID.451 (Dkt. 41). On November 2, 2020, he filed the instant motion for compassionate release (Dkt. 35). He argues that his underlying health conditions—diabetes, hypertension, and obesity—render him particularly vulnerable to contracting the virus a second time. The Government opposes Reed's motion, arguing that Reed's fear of reinfection is not an extraordinary and compelling reason to grant him release (Dkt. 38). The Government also argues that

---

[1] This case was reassigned to the undersigned on September 22, 2020.

the factors listed in § 3553(a) do not support granting Reed's motion. The Court agrees with the Government. Accordingly, Reed's motion is denied.[2]

## I.     LEGAL STANDARD

The First Step Act modified the statute concerning the compassionate release of federal prisoners, 18 U.S.C. § 3582(c), such that district courts may entertain motions filed by incarcerated defendants seeking to reduce their sentences. United States v. Ruffin, 978 F.3d 1000, 1003–1004 (6th Cir. 2020).[3] Before granting a compassionate-release motion, a district court must engage in a three-step inquiry: (i) the court must find that "extraordinary and compelling reasons warrant [a sentence] reduction," (ii) it must ensure "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (iii) it must "consider[] all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." United States v. Jones, 980 F.3d 1098, 1101 (6th Cir. 2020) (citing 18 U.S.C. § 3582(c)(1)(A)). If all of those requirements are met, the district court "may reduce the term of imprisonment," but it need not do so. 18 U.S.C. § 3582(c)(1)(A).

Regarding the first step of the inquiry, the Sixth Circuit has held that, with respect to motions for compassionate release filed by imprisoned individuals, "extraordinary and compelling" reasons are not limited to those set forth in U.S.S.G. § 1B1.13. Jones, 980 F.3d at 1109. It further held that "[u]ntil the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary

---

[2] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

[3] An incarcerated defendant must comply with the mandatory exhaustion requirements of § 3582(c) before filing a motion for compassionate release. Here, the Government concedes that Reed has satisfied the exhaustion requirement. See Resp. at 13.

and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." Id.

## II. ANALYSIS

### A. Extraordinary and Compelling Circumstances

With respect to motions for compassionate release premised on a defendant's fear of contracting COVID-19, the Sixth Circuit has held that "generalized fears of contracting COVID-19, without more, do not constitute a compelling reason" to grant compassionate release. United States v. Ramadan, No. 20-1450, 2020 WL 5758015, at *2 (6th Cir. Sept. 22, 2020). Rather, a defendant must point to specific conditions that create a higher risk that he will contract the virus. To determine whether a defendant's specific conditions render him particularly vulnerable to contracting COVID-19, courts generally consult the guidance on high-risk factors published by the Centers for Disease Prevention and Control (CDC). See Elias, 984 F.3d at 521.

Because Reed has already contracted and recovered from COVID-19, the relevant inquiry is whether Reed has a high risk of reinfection. Reed argues that "[t]here is a lack of medical evidence to support the claim that a person who previously tested positive for COVID-19, and is deemed recovered, is less susceptible to serious adverse health outcomes than they were before they were exposed to the virus." Mot. at 15. In so arguing, Reed ignores current CDC guidance, which unequivocally supports that "[c]ases of reinfection with COVID-19 have been reported, but remain rare."[4] This is because, as an "increasing number of published studies suggest," presently,

---

[4] CDC, Reinfection with COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html [https://perma.cc/5X2L-KU4V].

3

">90% of recovered COVID-19 patients develop anti-SARS-CoV-2 antibodies."[5] Further, "[a]dditional studies also demonstrate antibody response . . . can be durable for 6 months or more." Id. Because Reed has already contracted and recovered from COVID-19, he has likely developed antibodies that are potentially still providing him with immunity from the virus. Therefore, Reed's risk of reinfection is low. A low risk of reinfection is not an extraordinary and compelling reason warranting release. See, e.g., United States v. Johnson, No. 11-20493, 2021 WL 822495, at *3 (E.D. Mich. Mar. 4, 2021); United States v. Jackson, No. 17-55, 2021 WL 467590, at *2 (N.D. Ohio Feb. 9, 2021).

Reed contends that "[i]t also does not appear that any antibody test has been conducted on Reed, so there is no way to know whether he even has developed antibodies that might provide even some temporary protection." Mot. at 15. This argument fails for two reasons. First, this argument obscures the fact that the burden lies with Reed to prove his entitlement to compassionate release. See United States v. Benson, No. 1:13-cr-25, 2021 WL 928662, at *2 (S.D. Ohio Mar. 11, 2021) ("A person seeking sentence reduction bears the burden of proving entitlement to compassionate release."). Because it is Reed's burden to show that extraordinary and compelling reasons for compassionate release exist, the onus was on Reed to seek antibody testing to confirm his vulnerability to COVID-19. In other words, Reed cannot satisfy his burden by merely arguing that someone should have requested antibody testing—he was that someone. However, Reed does not argue that he ever sought antibody testing.

Second, having failed to obtain test results demonstrating the absence of antibodies, Reed's argument that he might remain susceptible to severe illness from COVID-19 after his first infection

---

[5] CDC, Interim Guidance on Ending Isolation and Precautions for Adults with COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html [https://perma.cc/A3JB-L29W].

is purely speculative. Granting compassionate release based on speculation would run afoul of the Sixth Circuit's mandate that courts cannot grant compassionate release based on mere "generalized fears of contracting COVID-19." See Ramadan, 2020 WL 5758015 at *2. Thus, the Court will not find extraordinary and compelling circumstances based on Reed's speculation that he might not have antibodies to protect him from reinfection. See, e.g., United States v. Goston, No. 15-20694, 2021 WL 872215, at *3 (E.D. Mar. 9, 2021) (declining to grant compassionate release based on defendant's "speculative" concern that a COVID-19 vaccine would not protect him against new strains of the virus).

Since Reed filed his motion in November 2020, several pertinent developments have occurred. Significantly, three COVID-19 vaccines have been developed and authorized for use in the United States, including two mRNA vaccines. According to the CDC, the mRNA vaccines reduce the risk of COVID-19 among people who are fully vaccinated "by 90 percent or more."[6] Regarding people who are vaccinated but still get COVID-19, the vaccines have been shown to "provide protection against severe illness and hospitalization among people of all ages eligible to receive them." Id. Significantly, "[t]his includes people . . . who are at higher risk of severe outcomes from COVID-19." Id. While the one non-mRNA vaccine is less effective at preventing infection, it "has been shown to [have] high efficacy at preventing hospitalization and death in people who did get sick."[7] Notably, the CDC reports that "[n]o one who got COVID-19 at least 4 weeks after receiving [this] . . . COVID-19 Vaccine had to be hospitalized." Id.

---

[6] CDC, "COVID-19 Vaccines Work," https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html [https://perma.cc/W7M8-9LHJ].

[7] CDC, "Johnson & Johnson's Janssen COVID-19 Vaccine Overview and Safety," https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/janssen.html [https://perma.cc/EHL8-AFV4].

The BOP has expeditiously worked to vaccinate all willing federal prison inmates. As of April 2021, the BOP projected that all federal prisoners would be offered the vaccine by mid-May.[8] It appears that the BOP has been effective in reaching this goal at FCI Elkton. According to the BOP's website, of the 1,398 inmates at FCI Elkton,[9] 1,093 have been fully vaccinated.[10] This 78% vaccination rate outpaces the national vaccination rate of adults; currently, 68% of adults have received at least one vaccination.[11] In light of FCI Elkton's high vaccination rate, it is unsurprising that at present, there are no confirmed active COVID-19 cases among FCI Elkton inmates, and only one staff case.[12]

The efficacy and availability of the COVID-19 vaccines at FCI Elkton further diminish any extraordinary and compelling nature of Reed's fear of contracting COVID-19 a second time at FCI Elkton. See, e.g., United States v. Groom, No. 2:17-cr-159, 2021 WL 1220225, at *2 (S.D. Ohio Apr. 1, 2021) (declining to grant compassionate release because the defendant was fully vaccinated); United States v. Miller, No. 13-20928, 2021 WL 1115863, at *2 (E.D. Mich. Mar. 24, 2021) (same). Hopefully Reed has taken advantage of the opportunity to be vaccinated and can now take comfort in knowing the protection that the vaccine provides him.

---

[8] Becky Sullivan, NPR, "All Federal Inmates To Be Offered Vaccine By Mid-May, BOP Director Says," https://www.npr.org/2021/04/16/988237102/all-federal-inmates-to-be-offered-vaccine-by-mid-may-bop-director-says [https://perma.cc/FTH7-68J2].

[9] BOP, FCI Elkton, https://www.bop.gov/locations/institutions/elk/ [https://perma.cc/3224-AEKQ].

[10] BOP, COVID-19 Vaccine Implementation, https://www.bop.gov/coronavirus/ [https://perma.cc/XH78-4UDF].

[11] CDC, COVID Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home [https://perma.cc/N7KT-TSJS].

[12] BOP, COVID-19 Cases, https://www.bop.gov/coronavirus/ [https://perma.cc/XH78-4UDF].

Reed's low risk of reinfection, coupled with the availability of highly effective COVID-19 vaccines and the low number of active COVID-19 cases at FCI Elkton, render Reed's fear of reinfection a non-compelling reason to grant him release. Even if Reed had shown the existence of extraordinary and compelling circumstances, his release would still be unwarranted based on the § 3553(a) factors, as explained below.

### B. Section 3553(a) Factors

Before granting a motion for compassionate release, a court must consider the factors listed in § 3553(a). These factors include the nature and circumstances of a defendant's offenses, the seriousness of the offenses, the need to promote respect for the law, and the need to protect the public from further crimes by the defendant. Although certain considerations support granting Reed's motion, others do not. On balance, the § 3553(a) factors weigh in favor of denying Reed's motion.

The nature and circumstances of Reed's offenses weigh against granting him release. When law enforcement agents searched Reed's computer, they recovered over 700 images and seven videos of child pornography depicting children as young as three to five years old. Presentence Investigation Report ¶¶ 13–14. Reed's collection also included depictions of adults engaged in sex acts with prepubescent children. Id. ¶ 13. Agents also searched Reed's email account and discovered that Reed had sent pornographic images from his computer to others. Id. ¶ 14.

Possession and distribution of child pornography are not victimless crimes. As the Sixth Circuit and other circuit courts have explained, "disseminating images perpetuates the producer's abuse, . . . the images represent an invasion of the privacy of the depicted child, and . . . the consumer creates an economic motive for the creation and distribution of child pornography."

United States v. Gray, 641 F. App'x 462, 468–469 (6th Cir. 2016) (citing United States v. Norris, 159 F.3d 926, 929 (5th Cir. 1998)). Thus, not only were Reed's crimes not victimless but, rather, they involved numerous victims—the children depicted in the numerous images and videos that Reed received and possessed. See id. (citing United States v. Hibbler, 159 F.3d 233, 237 (6th Cir. 1998)). Given his high number of victims, the extremely young ages of the victims, and the harm inflicted upon them, Reed's crimes were undoubtedly serious.

However, as Reed points out, several considerations support granting him release. For instance, Reed has served over half of his sentence. Additionally, as of December 2019, the BOP has classified Reed's risk of recidivism as "minimum"—the lowest risk level. See Inmate History (Dkt. 35-8). In prison, Reed has held jobs and participated in educational courses, including courses to obtain a commercial driver's license, which could increase his employability once released. See Mot. at 17. Further, Reed has not received a single disciplinary infraction while incarcerated. Id. Reed has strong support from his family members, several of whom wrote letters in support of Reed's motion for compassionate release. See Family Letters (Dkts. 35-9, 35-10, 35-11).

While Reed's efforts towards rehabilitation in prison are certainly laudable, there is one notable area of rehabilitation in which Reed has refused to participate: sex offender rehabilitation. At an intake screening in January 2014, Reed received information about the BOP's sex offender management program and agreed to participate in it. Gov't Ex. at PageID.505 (Dkt. 41). Reed's name was added to the waitlist for the program but in October 2015, he requested that his name be withdrawn. Id. at PageID.507. To date, Reed has not reenrolled in the sex offender management program.

Reed argues that his decision to remove his name from the program's waitlist should not be held against him. Specifically, he contends that he removed his name because the program "garnered a strongly negative reputation among inmates." Mot. at 21. He cites other cases in which defendants have reported concerns that intimate sexual information shared during program meetings is often relayed to inmates and staff outside of the program. Id. at 21–22. However, Reed does not report that this exact concern drove his decision to remove his name from the waitlist.

Perhaps in an attempt to assuage the Court's concerns about his failure to participate in programming specifically designed to rehabilitate sex offenders, Reed represents that if released now, he would return to his family home. Id. at 20. He also represents that he would be willing to abide by terms of supervision such as home confinement and location monitoring. Id. at 1. While home confinement might provide assurance that some sex offenders would not reoffend, it provides less assurance in Reed's case, as his home is the precise environment in which he possessed and distributed child pornography. Notably, another court within this circuit has rejected the argument that home confinement is sufficient to protect the public from child pornography crimes like those Reed committed. See United States v. Miezin, No. 1:13CR15, 2020 WL 1985042, at *5 (N.D. Ohio Apr. 27, 2020). Specifically, in denying a motion for compassionate release filed by a defendant convicted of receipt and distribution of child pornography, that court held that home confinement would not lessen the defendant's danger to the community. Id. As that court explained, "[the defendant's] crime does not require anything more than access to the internet. In today's society with smartphones, tablets, laptops, smart TVs, and countless other devices, it would not be possible to place [the defendant] in home confinement and eliminate his ability to engage in his prior criminal conduct." Id.

Reed argues that his home environment will not be the same environment in which he committed his crimes because, among other things, he will be required to submit to searches of his home by probation officers and he will have his computer and internet use monitored by probation officers. Reply at 3 (Dkt. 42). But even if internet use monitoring enables probation officers to detect commission of another child pornography crime by Reed during or after-the-fact, it cannot guarantee that Reed will be prevented from committing such crimes. Due to Reed's failure to participate in a rehabilitative sex offender program, the Court cannot say with any certainty that Reed would not commit further child pornography offenses if released to his home at this time. To protect the public and promote respect for the law, the Court declines to grant Reed's motion for compassionate release.

### III. CONCLUSION

For the reasons stated above, Reed's motion for compassionate release (Dkt. 35) is denied.

SO ORDERED.

Dated: July 21, 2021  
Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 21, 2021.

s/Karri Sandusky  
KARRI SANDUSKY  
Case Manager